**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and MCMILLIAN, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

April 18, 2014

# In the Court of Appeals of Georgia

A14A0515. BUILDERS INSURANCE v. TENENBAUM.

ELLINGTON, Presiding Judge.

Sheldon Tenenbaum obtained a judgment in the State Court of Chatham County against Hallmark Homes of Savannah, Inc., in his action for damages arising from defective construction of a house. To collect the judgment, Tenenbaum then initiated the instant garnishment action pursuant to OCGA § 18-4-60 et seq. against Hallmark, as the defendant, and Builders Insurance (A Mutual Captive Company), as the garnishee. In support of his request for a summons of garnishment, Tenenbaum averred that Builders holds garnishable assets owned by Hallmark, specifically, benefits that it owes to Hallmark under certain policies of commercial general

liability ("CGL") insurance that it issued to Hallmark.[1] Builders answered and denied that Hallmark is entitled to benefits under the subject policies. Tenenbaum and Builders filed motions for summary judgment; the trial court granted Tenenbaum's motion, denied Builders' motion, and directed that judgment be entered against Builders. We granted Builders' application for a discretionary appeal, and, for the reasons explained below, we affirm in part and vacate in part.[2]

---

[1] See *Ross v. St. Paul Reinsurance Co.*, 279 Ga. 92, 93-94 (610 SE2d 57) (2005) (The question of whether an insurance policy provides coverage for a judgment debtor can be litigated in a garnishment action by the judgment creditor directly against the judgment debtor's insurer.); *Morgan v. Morgan*, 156 Ga. App. 726, 727 (4) (275 SE2d 673) (1980) (The test as to whether funds in the hands of another are subject to garnishment is whether the defendant in garnishment could recover such funds by suit directly against the garnishee.).

[2] Georgia's Appellate Practice Act provides that, except as provided in OCGA § 5-6-34 (a) (5), which does not apply in this case, an "[a]ppeal[ ] from [a] case[ ] involving garnishment or attachment," OCGA § 5-6-35 (a) (4), may not be appealed directly, but requires an application for discretionary review under OCGA § 5-6-35 (b). See OCGA § 5-6-34 (a) (5) (authorizing a direct appeal from any "judgment[ ] or order[ ] granting or refusing an application[ ] for attachment against [a] fraudulent debtor[ ]").

2

Because the facts relevant to the question of whether the subject policies provided liability insurance benefits to Hallmark for Tenenbaum's claims are undisputed, we review the trial court's ruling de novo.[3]

The record shows the following. On November 17, 2002, Tenenbaum and Hallmark executed a contract for the construction of a house on Tenenbaum's property on Tybee Island in accordance with a certain set of architectural plans and specifications. After construction began in January 2003, Builders issued Hallmark a CGL policy for the period January 23, 2004, through January 23, 2005. Builders issued Hallmark CGL policies for subsequent terms, for a total of four policies, with the last policy period ending on July 10, 2008.

---

[3] *Resource Life Ins. Co. v. Buckner*, 304 Ga. App. 719, 726 (1) (698 SE2d 19) (2010) (Applying the rules of contract interpretation and construing a written insurance policy are matters of law for resolution by the trial court which are subject to de novo review on appeal.); *Smith v. Nationwide Mut. Ins. Co.*, 258 Ga. App. 570, 570-571 (574 SE2d 627) (2002) (applying de novo standard of review to insurance coverage issue decided on undisputed facts); see also *Benton v. Benton*, 280 Ga. 468, 470 (629 SE2d 204) (2006) ("[O]n appeal from the denial or grant of summary judgment[,] the appellate court is to conduct a de novo review of the evidence to determine whether there exists a genuine issue of material fact, and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.") (citations omitted); *Stoker v. Severin*, 292 Ga. App. 870, 871 (665 SE2d 913) (2008) ("When the evidence is uncontroverted and no question of witness credibility is presented, . . . the trial court's application of the law to undisputed facts is subject to de novo appellate review.") (citation omitted).

During the construction, Tenenbaum and the architect communicated with Hallmark's principals, Greg Hall and Stephen Hall, about deviations from the architectural plans and specifications and other alleged defects. As Hallmark completed construction in April 2004, the parties developed a "punch list" of specific issues to be completed or corrected. The punch list included problems with the stucco and leaks that had caused water damage to floors and areas of mold and rot.

Tenenbaum was never satisfied with Hallmark's efforts to correct the construction defects. On July 14, 2006, an attorney representing Tenenbaum wrote a letter to Stephen Hall, Hallmark's registered agent, "pursuant to OCGA § 8-2-38[4]

[4] The General Assembly passed OCGA § 8-2-35 through 8-2-43 in 2004, based on its finding that "Georgia needs an alternative method to resolve legitimate construction disputes that would reduce the need for litigation while adequately protecting the rights of homeowners." OCGA § 8-2-35. See OCGA § 8-2-36 (definitions). The General Assembly declared that "an effective alternative dispute resolution mechanism in certain construction defect matters should involve the claimant filing a notice of claim with the contractor that the claimant asserts is responsible for the defect and providing the contractor with the opportunity to resolve the claim without litigation." Id. Specifically, in every action subject to the act,

> the claimant shall, no later than 90 days before initiating an action against a contractor, provide service of written notice of claim on that contractor. The notice of claim shall state that the claimant asserts a construction defect claim or claims and is providing notice of the claim or claims pursuant to the requirements of this part. The notice of claim shall describe the claim or claims in detail sufficient to explain the nature of the alleged construction defects and the results of the defects. In addition, the claimant shall provide to the contractor any evidence

4

[to provide] a notice of claim as required prior to initiating an action against Hallmark . . . , as the contractor of . . . Tenenbaum's Tybee Island dwelling[.]" In the July 14, 2006 letter, Tenenbaum "assert[ed] construction defect claims[,]" including problems with the stucco and concrete floors. In that letter, Tenenbaum's attorney also asked Hallmark to disclose, pursuant to OCGA § 33-3-28,[5] each insurance company which might provide liability insurance coverage for his claims. Hallmark undertook to make repairs to correct the defects and resulting damage.

---

that depicts the nature and cause of the construction defect, including expert reports, photographs, and videotapes, if that evidence would be discoverable under evidentiary rules.

OCGA § 8-2-38 (a). See OCGA § 8-2-37 ("If a claimant files an action without first complying with the requirements of [the act], on application by a party to the action, the court or arbitrator shall stay the action until the claimant has complied with the requirements of [the act]," excluding causes of action for damages "due to personal injury or death[.]"); *Lumsden v. Williams*, 307 Ga. App. 163, 168 (2) (b) (704 SE2d 458) (2010).

[5] Every insurer providing liability or casualty insurance coverage in this state and which is or may be liable to pay all or a part of any claim shall provide, within 60 days of receiving a written request from the claimant, a statement, under oath, of a corporate officer or the insurer's claims manager stating with regard to each known policy of insurance issued by it, including excess or umbrella insurance, the name of the insurer, the name of each insured, and the limits of coverage.

OCGA § 33-3-28 (a).

By letter dated December 31, 2008, Tenenbaum's attorney again provided Hallmark with ante litem notice of "numerous construction defects" that Tenenbaum had brought to Hallmark's attention "through the years" and stated that "[t]here continue[ ] to be leaks, moisture issues and stucco problems." The letter specified, inter alia, that

> [m]oisture has been discovered infiltrating the front porch which is causing mold and rot in the ceiling space. The leaks and resulting damage [are] caused by improper flashing installed by Hallmark. . . . There also continue[ ] to be leaks and moisture problems on the rear of the house. . . . On the rear of the house[,] water leaks into the house and is getting into the speakers and lights in the ceiling. Apparently, these leaks are also caused by improper flashing on the rear decks.

In the letter, counsel stated that, if Hallmark failed to settle his claims by making repairs, paying compensation, or both, Tenenbaum "may bring an action against Hallmark . . . for the damage and defective conditions described." Hallmark again undertook to make repairs.

By letter dated August 4, 2009, Tenenbaum's attorney conveyed Tenenbaum's order that Hallmark cease work. Counsel advised Hallmark that Tenenbaum had hired another contractor to address the damage resulting from the construction defects. Counsel also reiterated the request that Hallmark disclose its liability insurance

6

carriers and requested Hallmark's agent to "promptly place any liability insurer that may provide coverage to you for these claims upon notice of Mr. Tenenbaum's intent to seek recovery from Hallmark[.]"

On December 18, 2009, Tenenbaum filed his suit for damages against Hallmark, asserting claims for breach of contract, breach of express warranty, and breach of implied warranty. On January 21, 2010, Hallmark notified Builders of Tenenbaum's action and requested that Builders provide a defense under the four CGL policies.

By letter dated February 12, 2010, Builders agreed to defend Hallmark subject to a reservation of rights. In addition to a global reservation of its right to disclaim liability, Builders cited several specific provisions contained in the policies. Builders stated that the reservations specified in the letter were not meant to be exclusive but were the ones of which it was presently aware, and it reserved the right to amend its reservation of rights after further investigation.[6]

---

[6] Builders stated that,

by quoting specific portions of [the policies, Builders] does not hereby waive any other defenses it may have under the subject policies or the law. The specific reservations set forth in this letter are not meant to be exclusive but are the only ones of which Builders . . . is presently aware. Builders . . . intends to reserve its rights on all possible coverage bases, not simply those set forth in this letter. Should further facts be presented

By letter dated September 19, 2011, Builders made a "supplemental response" to Hallmark's notice of claim, reiterating that it was providing a defense under a reservation of rights and affirmatively stating that it had determined that there was no coverage for Tenenbaum's claims. Builders' September 19, 2011 letter noted that Hallmark had received Tenenbaum's statutory notices of claims in 2006 and 2008 but first provided notice to Builders of Tenenbaum's allegations in 2010.

After a bench trial, the trial court ruled in favor of Tenenbaum in his suit for damages and entered judgment against Hallmark in the amount of $366,867.48. In this ensuing garnishment action, the trial court determined that Tenenbaum's judgment was a covered liability under Hallmark's CGL policies such that Builders was liable as a garnishee for Hallmark's debt.[7]

---

or be uncovered in the ongoing investigation, Builders . . . reserves the right to modify, amend or supplement the position set forth in this letter. Nothing in this letter should be construed as an admission of liability for any portion of the claims or occurrences noticed, or as a waiver, modification or estoppel with respect to the . . . policy terms, conditions, limitations, or exclusions. All of Builders['] . . . rights, remedies or defenses, both legal and equitable, remain expressly reserved.

[7] See *Pinkerton & Laws Co. v. Ins. Co. of N. America*, 121 Ga. App. 26, 29 (2) (172 SE2d 465) (1970) (In order to establish a debt under an insurance policy owing by an insurer to the defendant in garnishment, the plaintiff must "show the insured's compliance with all the conditions of the policy and connect the judgment with the garnishee's liability under the policy.") (citation and punctuation omitted).

1. Builders contends that the trial court erred in finding coverage, because Hallmark failed to satisfy its obligation under the policies to provide prompt notice to Builders of Tenenbaum's claims.

Although the four CGL policies that Builders issued to Hallmark were not identical in every respect, each included the following relevant definitions, terms, and conditions in the coverage for property damage:

*Insuring Agreement [and Duty to Defend]*
> [Builders] will pay those sums that [Hallmark] becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies. [Builders] will have the right and duty to defend [Hallmark] against any "suit" seeking those damages. . . .
> This insurance applies to . . . "property damage" only if . . . [t]he . . . "property damage" is caused by an "occurrence[.]" . . .

*Duties in the Event of Occurrence, Offense, Claim or Suit*
> a. [Hallmark] must see to it that [Builders is] notified as soon as practicable of an "occurrence" or of an offense which may result in a claim. . . .
> b. If a claim is made or "suit" is brought against any insured, [Hallmark must . . . [n]otify [Builders] as soon as practicable. You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

*Definitions*
> "Occurrence" mean an accident, including continuous or repeated exposure to substantially the same general harmful conditions. . . .
> "Property damage" means . . . [p]hysical injury to tangible property, including all resulting loss of use of that property. . . .
> "Suit" means a civil proceeding in which damages because of . . . "property damage" . . . to which this insurance applies are alleged. . . .

In the underlying suit concerning Hallmark's liability, Tenenbaum obtained a judgment for damages for defective construction rendered by Hallmark (the insured). As the Supreme Court of Georgia has explained, CGL coverage generally is *not* intended to insure against liabilities "for the repair or correction of the faulty workmanship of the insured." (Citation omitted.) *Taylor Morrison Svcs., v. HDI-Gerling America Ins. Co.*, 293 Ga. 456, 460-461 (1) (746 SE2d 587) (2013).[8] Construing the standard CGL insuring agreement, "the usual and common meaning of 'accident,' the definition of 'occurrence' that flows therefrom, and the additional limitations imposed by the requirement of 'property damage[,]'" the Supreme Court held, however, that, subject to specific exclusions, a CGL policy *may* provide coverage when the defective work of the insured unexpectedly damages other, nondefective property or work. Id. at 461 (1). In this case, the trial court, which sat as the finder of fact in the underlying litigation, stated that it had based the judgment against Hallmark on such damage to nondefective work caused by other defective work, specifically, damages to framing, support beams, sheathing, sheetrock, and

---

[8] Cf. *Kay-Lex Co. v. Essex Ins. Co.*, 286 Ga. App. 484, 486 (649 SE2d 602) (2007) ("Generally speaking, a commercial general liability policy covers certain business losses and situations in which a business is liable to a third party for personal injury or property damage.") (citation and punctuation omitted).

10

interior walls caused by improperly installed windows, improperly installed roofing materials, and improper flashing. Based on this, the trial court determined that the construction defects at issue constituted an occurrence that caused property damage, within the terms of the subject CGL policies.

As noted above, Hallmark's duty under the policies to notify was not limited to giving Builders notice of the commencement of formal legal proceedings against Hallmark alleging liability for an accident; the policies placed a separate and distinct duty upon Hallmark to notify Builders "as soon as practicable of an 'occurrence' . . . which may result in a claim." Absent some justification, an insured's failure to provide timely notice of an occurrence can defeat coverage under such a CGL policy, because a notice provision expressly made a condition precedent to coverage is valid and enforceable. *Kay-Lex Co. v. Essex Ins. Co.*, 286 Ga. App. 484, 488 (1) (a) (649 SE2d 602) (2007). "[T]he facts and circumstances of a particular case may render an insured's delay in giving notice of an occurrence to his insurer unjustified and unreasonable as a matter of law." (Punctuation and footnote omitted.) *State Farm &c. Cas. Co. v. Walnut Ave. Partners*, 296 Ga. App. 648, 651 (2) (675 SE2d 534) (2009).[9] Still,

---

[9] See *Kay-Lex Co. v. Essex Ins. Co.*, 286 Ga. App. at 490 (1) (a) (accord).

11

> Georgia courts do not favor forfeitures [by insureds] in construing insurance contracts. Rather, courts infer waiver [by insurers] of non-essential parts of an insurance contract that are penal in nature. Courts strictly construe provisions of the contract that benefit the insurer and find even "small circumstances" show waiver by the insurance company.

(Citations and punctuation omitted.) *Hoover v. Maxum Indem. Co.*, 291 Ga. 402, 407 (3) (730 SE2d 413) (2012). Thus, defenses to coverage can be waived where the insurer, without reserving its rights, assumes the defense of an action or continues such defense with knowledge, actual or constructive, of noncoverage. *World Harvest Church v. GuideOne Mut. Ins. Co.*, 287 Ga. 149, 151 (695 SE2d 6) (2010); *Prescott's Altama Datsun v. Monarch Ins. Co.*, 253 Ga. 317, 318 (319 SE2d 445) (1984).[10] An

---

[10] The insurer can avoid estoppel by giving timely notice of its reservation of rights which fairly informs the insured of the insurer's position. . . . At a minimum, the reservation of rights must fairly inform the insured that, notwithstanding the insurer's defense of the action, it disclaims liability and does not waive the defenses available to it against the insured. The reservation of rights should also inform the insured of the specific basis for the insurer's reservations about coverage[.]

(Citations and punctuation omitted.) *World Harvest Church v. GuideOne Mut. Ins. Co.*, 287 Ga. 149, 152 (695 SE2d 6) (2010). See generally Sonja Larsen, 16 Ga. Jur. Insurance § 19.8 (updated March 2014); Frank E. Jenkins III et al., Ga. Automobile Insurance Law § 16:1 (2013-2014 ed.); Judith F. Goodman et al., 1 Law and Practice of Ins. Coverage Litigation, §§ 8:5, 8:9 (updated June 2013).

insured's failure to satisfy a policy's notice provisions under the policy is such a defense to coverage. See *Hoover v. Maxum Indem. Co.*, 291 Ga. at 407 (3).

According to Builders, Hallmark's duty to notify it of an occurrence was triggered, if not sooner, by Tenenbaum's July 2006 and December 2008 ante litem notices. Hallmark's failure to notify Builders of Tenenbaum's threatened litigation until January 2010 would ordinarily provide a defense to coverage.[11] The record shows, however, that Builders was aware of Tenenbaum's July 2006 and December 2008 ante litem notices – which Tenenbaum referenced in his complaint – when it issued its *first* reservation-of-rights letter in February 2010, but it failed to notify Hallmark of that defense to coverage until its supplemental reservation-of-rights letter in September 2012. Although an insurer is not required to list each and every basis for contesting coverage in its initial reservation-of-rights letter in order to preserve its right to later assert a particular ground for noncoverage,[12] it must act reasonably

[11] *Kay-Lex Co. v. Essex Ins. Co.*, 286 Ga. App. at 490 (1) (a) (An unexcused one-year delay in notice to the insurer was unreasonable as a matter of law.); *Allstate Ins. Co. v. Walker*, 254 Ga. App. 315, 316-317 (1) (562 SE2d 267) (2002) (accord).

[12] *Kay-Lex Co. v. Essex Ins. Co.*, 286 Ga. App. at 491 (1) (b); *North Metro Directories Publishing v. Cotton States Mut. Ins. Co.*, 279 Ga. App. 492, 496 (2) (631 SE2d 726) (2006); *Govt. Employees Ins. Co. v. Progressive Cas. Ins. Co.*, 275 Ga. App. 872, 876-877 (3) (622 SE2d 92) (2005); Frank E. Jenkins III et al., Ga. Automobile Insurance Law § 16:3 (2013-2014 ed.).

promptly upon learning of a policy defense.[13] Thus, although Hallmark failed to give Builders timely notice of Tenenbaum's claims, Builders in turn failed to give Hallmark timely notice of its intention to assert Hallmark's untimely notice as a defense to coverage and thereby waived that defense. Builders' argument that it was entitled to summary judgment based on Hallmark's untimely notice therefore fails.

2. Builders contends that Hallmark had knowledge of Tenenbaum's claims prior to the inception of the policies. Because the policies did not cover claims that

---

[13] See *Hoover v. Maxum Indem. Co.*, 291 Ga. 402, 407 (3) (730 SE2d 413) (2012) ("[B]oilerplate language in [a] denial letter purporting to reserve the right to assert a myriad of other defenses at a later date[, including that coverage could be barred to the extent the insured failed to comply with the notice provisions under the policy,] did not clearly put [the insured] on notice of [the insurer's] position[,]" and, therefore, the attempted reservation of rights was defective.); *Daniel v. Safeway Ins. Co.*, 199 Ga. App. 833, 835 (2) (406 SE2d 266) (1991) (An insurer waives a defense to coverage if it fails to act promptly in asserting its rights.); *Home Indem. Co. v. Godley*, 122 Ga. App. 356, 361 (1) (177 SE2d 105) (1970) (An insurer is required to act seasonally in disclaiming liability.); *State Farm Mut. Auto. Ins. Co. v. Anderson*, 104 Ga. App. 815, 818 (123 SE2d 191) (1961) (An insurer's delay in notifying an insured of a basis for denying coverage will be excused where it is traceable to the insurer's lack of actual or constructive knowledge of the available defense.); see generally, Judith F. Goodman et al., 1 Law and Practice of Ins. Coverage Litigation, § 8.22 (updated June 2013); Tom Muskus, 16 Ga. Jur. Insurance, § 10:13 (updated March 2014).

were known to Hallmark before the specified policy period,[14] Builders contends that the trial court erred in finding coverage.

As evidence that Hallmark knew of Tenenbaum's claims before January 23, 2004, when the first policy period began, Builders cites to Tenenbaum's communications with Greg Hall and Steve Hall on April 9 and September 16, 2003. Neither of these communications, however, makes any reference to damage to framing, support beams, sheathing, sheetrock, and interior walls caused by improperly installed windows, improperly installed roofing materials, and improper flashing, that is, to damage to nondefective work, as found by the trial court. Accordingly, this argument is not supported by the record.

3. Builders contends that, if coverage exists, the amount of the judgment is incorrect.

(a) Builders contends that the policies contained a self-insured retention of $50,000, that its obligation to pay applied only to damages in excess of the self-insured retention, and, therefore, that the garnishment judgment must be reduced by

---

[14] Under the policies, coverage applies only if "property damage occurs during the policy period[ ] and[,] [p]rior to the policy period, no insured . . . and no employee authorized by you to give or receive notice of an occurrence or claim[ ] knew that the . . . property damage had occurred, in whole or in part."

that amount. The record shows, however, that the self-insured retention cited by Builders applied to claims for property damage "arising out of each temporary or permanent dwelling unit sold by [Hallmark] without a home warranty[.]" Because Tenenbaum's claims for property damage did not arise out of a home sold by Hallmark, however, we find no basis for applying the self-insured retention to Tenenbaum's judgment against Hallmark.

(b) The record shows that, before trial in the underlying action, Hallmark settled its third-party claims against the architect and four of Hallmark's subcontractors for a total of $182,500 and dismissed the third-party defendants. Of that amount, only $157,500 was paid into the registry of the court. As a result of the trial in the underlying action, the trial court entered judgment against Hallmark in the amount of $366,867.48. Then, in this garnishment action, the trial court entered judgment against Builders in the amount of $209,484.98, or $157,382.50 less than the total judgment against Hallmark. Because the third-party defendants collectively were legally obligated to pay $182,500 based on Tenenbaum's claims against Hallmark, the trial court erred in not setting off that greater amount when calculating Builders' liability under the policies. *Bishop v. Georgia Baptist Hosp.*, 136 Ga. App. 507, 508-

509 (221 SE2d 682) (1975). Accordingly, the judgment is vacated and the case is remanded for correction of the judgment.

*Judgment affirmed in part and vacated in part; case remanded. Phipps, C. J., and McMillian, J., concur.*